MARY K. WARREN (NY Reg. #2557684)
(Application for Pro Hac Vice Admission Pending)
Email: mary.warren@cfpb.gov
Phone: (202) 435-7815
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-7722

OWEN MARTIKAN, CA Bar #177104 - Local Counsel
301 Howard St., Suite 1200
San Francisco, CA  94105
Phone: (415) 844-9790
Email: owen.martikan@cfpb.gov

Attorneys for Plaintiff
Consumer Financial Protection Bureau

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Consumer Financial Protection Bureau, <br><br>          Plaintiff, <br><br>     v. <br><br> Judith Noh d/b/a Student Loan Pro, Judith Noh as an individual, and Syed Faisal Gilani, <br><br>          Defendants, and <br><br> FNZA Marketing, LLC, <br><br>          Relief Defendant. | Case No. 8:21-cv-00488 <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, DISGORGEMENT, AND CIVIL MONEY PENALTIES** |

## Introduction

1. The Consumer Financial Protection Bureau ("Bureau") brings this action against Judith Noh d/b/a Student Loan Pro, Judith Noh as an individual, Syed Faisal Gilani, and FNZA Marketing, LLC under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c), 6105(d); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310; and the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5536(a), 5564, 5565, in connection with the marketing and sale of debt-relief services by Judith Noh d/b/a Student Loan Pro ("Student Loan Pro"). This Court has subject-matter jurisdiction over this action because it is brought under federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

2. Defendants Student Loan Pro, Judith Noh, and Syed Faisal Gilani (the "Debt-Relief Defendants") created and operated a student-loan debt-relief service that charged unlawful advance fees to consumers.

3. Defendant FNZA Marketing, LLC ("FNZA"), which operated no business of its own, was the recipient of certain of the funds obtained by the Debt-Relief Defendants from charging unlawful advance fees.

4. The Bureau brings this action to stop the Debt-Relief Defendants' unlawful conduct, obtain relief for harmed consumers, and impose civil money penalties.

## Venue

5. Venue is proper in this district because each Defendant is located, resides, or does business in this District. 12 U.S.C. § 5564(f).

## Parties

6. The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). It has independent litigating authority and may secure appropriate relief for violations of the CFPA, 12 U.S.C. § 5564(a)-(b), and for violations

COMPLAINT

2

of the TSR with respect to consumer financial products or services subject to the CFPA, 15 U.S.C. §§ 6102(c), 6105(d).

7. Student Loan Pro, a California sole proprietorship of Judith Noh, has operated out of 18001 Sky Park Circle, Irvine, CA, 92614. From 2015 until 2019, Student Loan Pro advertised, marketed, promoted, offered for sale, sold, and provided financial advisory services in the form of debt-settlement services, in particular federal student-loan debt-relief services, to consumers throughout the United States.

8. Judith Noh is the sole proprietor and owner of Student Loan Pro. Noh resides in Anaheim, California.

9. Syed Faisal Gilani was the manager and owner-in-fact of Student Loan Pro. Gilani resides in Irvine, California.

10. FNZA is a California limited liability company of which Noh is the sole member but which is controlled in fact by Gilani.

**Student Loan Pro's Business Practices**

11. Student Loan Pro is a federal student-loan document-preparation and debt-relief service that operated from 2015 to 2019. It prepared and submitted paperwork for consumers to the U.S. Department of Education ("ED") in support of applications for loan consolidation, income-driven repayment plans, forgiveness programs, and other debt-relief options available to consumers with federal student loans. It also submitted recertification paperwork to ED, as applicable, after a consumer's application for repayment programs was accepted.

12. ED does not charge federal student-loan borrowers to submit applications for or to participate in loan consolidation, income-driven repayment plans, forgiveness programs, and other debt-relief programs or to submit recertification paperwork for those programs.

13. Student Loan Pro was loosely organized into two units: the sales staff, who took consumer calls and signed up those consumers who agreed to purchase Student

Loan Pro's services, and the processing staff, who completed and submitted the loan modification paperwork for the consumer. Each unit had a manager who reported to Gilani.

14. Student Loan Pro marketed its services through radio advertisements. When consumers called the phone number given in the advertisements, they were connected to one of the company's sales staff.

15. The salesperson would pitch Student Loan Pro's services to the consumer and, if the consumer agreed to enroll, would email a contract to the consumer for electronic signature. The salesperson also took the consumer's payment information and generated a schedule of payments that was attached to the contract, which the consumer was required to pre-authorize.

16. The salesperson would then refer the consumer to the processing department, where a processor would read a "verification script" to the consumer and obtain the consumer's oral confirmation of her payment method and the amounts to be paid.

17. Student Loan Pro charged a $695 to $795 initial fee plus $39 per month. The company required customers to pay the $695 to $795 initial fee in three installments within the first three months after the customer signed the contract. The second and third installments of the initial fee were due 30 and 60 days, respectively, after the first payment was made. The company's practice was to try to persuade the customer to begin paying the fee as soon as possible after signing up, including paying at the time of enrollment.

18. Student Loan Pro's script used by its sales staff states: "The purpose of the initial fee is for us to prepare and submit your application on your behalf to the Department of Education for its consolidation program." The company's practice was not to submit the customer's loan consolidation or modification application to ED until the customer had paid at least the first installment of the initial fee.

19. The customer would pay $39 per month beginning one month after the third installment of the "initial fee" was paid. The $39 monthly fee was required as long as the customer remained with Student Loan Pro and was purportedly for the company's services in monitoring the customer's loan account and recertifying the customer's eligibility for the loan modification that Student Loan Pro obtained for him or her. All customers paid the monthly fee, although recertification is not required for all loan modification programs, such as consolidation.

20. After the contract was signed, Student Loan Pro automatically charged or debited the customer's bankcard or debited the customer's bank account for the three installments of the "initial fee" and the monthly $39 fee on the dates listed in the schedule attached to the contract.

21. Student Loan Pro did not monitor whether or when the customer made a first payment on his or her consolidated or modified student loan debt. Student Loan Pro did not wait until the terms of a customer's debt were altered, or until a customer had made his or her first payment on the altered debt, before requesting or receiving fees from the customer.

22. From 2015 to 2019, Student Loan Pro enrolled more than 3,300 customers in multiple states. During that period, the company's customers paid more than $3,500,000 in fees. Student Loan Pro ceased operations in November 2019.

**Role of Judith Noh**

23. Noh and Gilani organized Student Loan Pro's corporate structure to conceal Gilani's role as the company's de facto owner and chief executive.

24. In September 2015, Noh formed and registered Student Loan Pro as an Orange County sole proprietorship under the name "Judith Noh d/b/a/ Student Loan Pro." Noh is the owner of Student Loan Pro and all of its assets and liabilities.

25. Noh opened three bank accounts under the name of Judith Noh d/b/a Student Loan Pro and designated Gilani as a co-signer on them all. Noh opened merchant

processing accounts and signed contracts with the payment processing companies for Student Loan Pro so that Student Loan Pro could accept credit and debit card payments from consumers. She designated Gilani as the contact person at Student Loan Pro for those accounts.

26. Noh also opened an account with Debt Pay, Inc., so that her company could use its DebtPayPro customer relations management database to enter customer information and contracts, monitor customer payments, and record progress on consolidating or otherwise modifying customers' student loan debt. Noh gave Gilani access to Student Loan Pro's DebtPayPro database.

27. Noh was listed as the owner and customer complaint contact for Student Loan Pro on the Better Business Bureau's public website.

28. Noh became involved in an investigation conducted by the Washington State Attorney General's Office ("Washington AG") concerning the fees charged by Student Loan Pro, among other aspects of Student Loan Pro's operations. On April 21, 2017, a copy of the Washington AG's civil investigative demand investigating Student Loan Pro for possible "unfair or deceptive acts or practices … associated with the consolidation or adjusting of student loan debt" was delivered to Noh's home address.

29. Student Loan Pro settled the investigation with the Washington AG by entering into an Assurance of Discontinuance that required the company to, among other things, provide restitution to customers residing in Washington State. On August 12, 2017, Noh wrote and signed the check to the Washington AG for restitution to Washington customers under the Assurance of Discontinuance.

30. In 2013, Noh registered a California limited liability company called Quick Student Loan Solution, LLC. ("QSLS"), with herself as the sole member. According to consumer complaints, QSLS offered student-loan debt-relief services and it was managed by Syed Gilani. Noh cancelled the registration of QSLS in September 2015 around the time she registered Student Loan Pro.

### Role of Syed Gilani

31. Gilani ran all aspects of Student Loan Pro's operations and used its earnings for his personal expenditures.

32. Gilani was a signatory on the company's bank accounts and had his own debit card for the main operating account. Gilani routinely wrote checks on or made withdrawals or transfers from the company's accounts.

33. Gilani supervised the managers of the company both in person at the company's offices and by telephone and email. Gilani determined the fee to be paid by customers, including that fees were to be requested and received before the customer had made at least one payment on his or her altered debt.

34. Gilani edited the scripts that Student Loan Pro's sales staff used to sign up consumers and had the final say over their content.

35. Gilani monitored the company's DebtPayPro database on a daily basis to check on the status of customer payments and new enrollments.

36. Gilani managed the company's merchant processing accounts and was the primary contact person with the payment processors.

37. Gilani was informed of customer complaints by emails to him from the company's payment processors and the Better Business Bureau and by reports from his managers. On some occasions he spoke directly with the complaining customer.

38. Gilani was personally involved in settling the Washington AG investigation and another investigation by the Minnesota Department of Commerce. After the state actions were settled, Gilani did not change Student Loan Pro's practices with respect to advance fees, although the Minnesota investigation specifically addressed them.

### Role of FNZA

39. Noh formed FNZA as a California limited liability company in September 2015, with herself as the sole member. Noh opened a bank account for FNZA soon

thereafter and made Gilani a co-signer. Gilani obtained a debit card for the FNZA account.

40. FNZA operated no business. FNZA provided no services to Student Loan Pro. FNZA made no loans to Student Loan Pro.

41. Gilani transferred more than $400,000 from the operating account of Student Loan Pro to FNZA's bank account. Gilani's transfers from Student Loan Pro to FNZA consisted of advance fees illegally obtained from Student Loan Pro customers as a result of the Debt-Relief Defendants' violations of the TSR and CFPA.

42. Gilani withdrew the funds transferred from Student Loan Pro to FNZA for personal expenditures, including purchases at Bloomingdale's and visits to nightclubs. The bulk of such expenditures were repeated "purchases" of $10,000 or $5,000 at California and Nevada casinos.

**VIOLATIONS OF THE TSR BY THE DEBT-RELIEF DEFENDANTS**

43. The Bureau is authorized to enforce the Telemarketing Act and the TSR with respect to the offering or provision of a consumer financial product or service subject to the CFPA. 15 U.S.C. § 6105(d). Among other things, a consumer financial product or service is defined by the CFPA to include "providing financial advisory services … including … providing services to assist a consumer with debt management or debt settlement [or] modifying the terms of any extension of credit…." 12 U.S.C. § 5481(15)(viii)(II).

44. The TSR defines "debt relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." 16 C.F.R. § 310.2(o).

45. The TSR defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd).

46. The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer…." 16 C.F.R. § 310.2(ff).

47. The TSR defines "telemarketing" in relevant part as "a plan, program, or campaign which is conducted to induce the purchase of goods or services … by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

48. Student Loan Pro is a telemarketer within the meaning of the TSR that engaged in telemarketing of debt-relief services to consumers. Student Loan Pro's marketing of its services was done via telephone by the company's sales representatives. The use of the telephone was part of a "plan, program, or campaign" to sell Student Loan Pro's services, and involved more than one phone and more than one interstate phone call. Consumers who spoke to sales representatives of Student Loan Pro resided in a number of different states outside of California, where Student Loan Pro is located.

49. Student Loan Pro is a seller under the TSR because, in connection with its telemarketing, it offered to provide, and did provide, services related to federal student-loan debt in exchange for a fee. Those services were debt-relief services under the TSR because Student Loan Pro represented it would settle, renegotiate, or alter the terms of repayment or other terms of customers' federal student-loan debt.

## Count I

*Violations of the TSR by the Debt-Relief Defendants*

*(Requesting and Receiving Advance Fees)*

50. The Bureau re-alleges and incorporates by reference paragraphs 1-38 and 43-49.

51. It is a violation of the TSR for any seller or telemarketer in connection with the sale of any debt-relief service to request or receive payment of any fee or consideration for any debt-relief service until and unless: (1) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customer; and (2) the customer has made at least one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i).

52. Student Loan Pro is a seller and telemarketer that provided, offered to provide, or arranged for others to provide debt-relief services.

53. By the methods described above in paragraphs 11-22, Student Loan Pro requested and received fees from its customers before Student Loan Pro had renegotiated, settled, reduced, or otherwise altered the terms of their debts pursuant to a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customers, and before its customers had made one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector.

54. Gilani, as the controlling manager and de facto owner of Student Loan Pro, and as a signatory on its bank accounts, had the authority to control Student Loan Pro's telemarketing and the manner and timing of its requests for and receipt of fees.

55. Gilani established Student Loan Pro's fee structure, and approved the timing of the fees, in particular that customers would be charged prior to any loan modification.

56. Gilani knew or recklessly disregarded the fact that Student Loan Pro was engaged in telemarketing and that it was requesting and receiving fees from customers before the terms of their debts were altered and before they had made one payment on their altered debt.

57. Noh, as the sole proprietor of Student Loan Pro, owns the assets and liabilities of Student Loan Pro.

58. Noh, as the owner of Student Loan Pro, with signatory authority over its bank accounts and merchant-processing accounts, had control over when and how much the company charged customers for its services. Because Student Loan Pro was Noh's sole proprietorship, Noh had the power to close those accounts at any time or to remove Gilani as the authorized signatory or contact, and she had the authority to cancel or modify contracts with customers, or to change the practices of the company.

59. Noh knew or recklessly disregarded the fact that Student Loan Pro was engaged in telemarketing and taking advance fees from customers. She had access to the company's bank records, merchant-processing accounts, and the DebtPayPro database, which would have provided this information.

60. Noh recklessly disregarded indications that the company was engaged in illegal conduct. The Washington AG sent its civil investigative demand to her at her home, she signed Student Loan Pro's check to compensate Washington State customers, and the Assurance of Discontinuance, reflecting the company's violation of Washington state law, was a public document.

61. In providing a corporate façade for Gilani by means of her sole proprietorship, Student Loan Pro, Noh recklessly disregarded, if not knew, that fraudulent or other unlawful conduct was occurring at her company.

62. In addition, Noh's prior establishment of QSLS, which Gilani operated even though Noh was the sole member of the company, shows that Noh knew or recklessly disregarded that Gilani was engaged in unlawful conduct.

63. Therefore, Student Loan Pro, Gilani and Noh have engaged in abusive telemarketing acts or practices in violation of 16 C.F.R. § 310.4(a)(5).

## Count II

*Violations of the TSR by Gilani and Noh*

*(Substantial Assistance to Student Loan Pro in its Violations of the TSR)*

64. The Bureau re-alleges and incorporates by reference paragraphs 1-38 and 43-49.

65. The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that constitutes deceptive or abusive conduct under the TSR. 16 C.F.R. § 310.3(b).

66. Student Loan Pro is a seller and telemarketer that provided, offered to provide, or arranged for others to provide debt-relief services.

67. In the course of offering to provide or providing a debt-relief service to customers, Student Loan Pro requested and received fees before Student Loan Pro had renegotiated, settled, reduced, or otherwise altered the terms of its customers' debts pursuant to a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customers and before the customers had made one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement between the customers and the creditor or debt collector. Thus, Student Loan Pro engaged in abusive acts or practices in violation of the TSR. 16 C.F.R. § 310.4(a)(5).

68. Gilani, as the controlling manager and de facto owner of Student Loan Pro, provided substantial assistance or support to Student Loan Pro by, among other things, overseeing the company's managers and participating in the company's day-to-day business operations. Gilani was a signatory on the company's bank accounts, managed its relationships with its payment processors, and set the manner and timing of the company's fee structure. Gilani managed the company's radio advertising campaign.

69. Gilani knew or recklessly disregarded the fact that Student Loan Pro was engaged in telemarketing and it was requesting and receiving fees from customers before it altered the terms of those customers' debt or they had made one payment on that altered debt.

70. Noh provided substantial assistance to Student Loan Pro by, among other things, setting up its corporate structure, its bank accounts, its merchant-processing accounts, and the DebtPayPro database.

71. Noh knew or recklessly disregarded the fact that Student Loan Pro was engaged in telemarketing and taking advance fees from customers. She had access to the bank records, merchant-processing accounts, and the DebtPayPro database, which would have provided this information.

72. Noh recklessly disregarded indications that the company was engaged in illegal conduct. The Washington AG sent its civil investigative demand to her at her home, she signed Student Loan Pro's check to compensate Washington State customers, and the Assurance of Discontinuance, reflecting the company's violation of Washington state law, was a public document.

73. In providing a corporate façade for Gilani, Noh recklessly disregarded, if not knew, that illegal conduct was underway.

74. Therefore, Gilani and Noh have violated the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

**VIOLATIONS OF THE CFPA BY THE DEBT-RELIEF DEFENDANTS**

**Count III**

*Violations of the CFPA by the Debt-Relief Defendants*

*(CFPA Violations Based on Violations of the TSR)*

75. The Bureau re-alleges and incorporates by reference paragraphs 1-38 and 43-49.

76. Section 1036(a)(1)(A) of the CFPA provides that it is "unlawful for any covered person to offer or provide to a consumer a financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

77. Student Loan Pro is a covered person because it offers or provides consumer financial products or services, namely financial advisory services to assist consumers with modifying the terms of any extension of credit, including by debt settlement. 12 U.S.C. §§ 5481(6), (15)(A)(viii)(II).

78. Under the CFPA, a "related person" is a covered person. 12 U.S.C. § 5481(25)(B). Gilani is a related person with respect to Student Loan Pro because he was an "employee … charged with managerial responsibility" for Student Loan Pro. 12 U.S.C. § 5481(25)(C)(i). Noh is a related person because she is the controlling sole proprietor of Student Loan Pro. 12 U.S.C. § 5481(25)(C)(i). Both Gilani and Noh are thus covered persons. 12. U.S.C. § 5481(25)(B).

79. Any act or omission in violation of a federal consumer financial law by a covered person is a violation of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

80. The TSR is a federal consumer financial law as defined by the CFPA. 12 U.S.C § 5481(14); 15 U.S.C § 6105(d).

81. Therefore, the Debt-Relief Defendants' violations of the TSR, described in Counts I and II, constitute violations of section 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

**DISGORGEMENT OR COMPENSATION FOR UNJUST ENRICHMENT BY RELIEF DEFENDANT**

**Count IV**

82. The Bureau re-alleges and incorporates by reference paragraphs 1-6, 10, and 39-42.

83. FNZA has received cash transfers and other monetary transfers from Student

Loan Pro that are traceable to funds obtained from consumers through violations of the CFPA and TSR, as alleged in Counts I through III of this Complaint. It has no legitimate claim to such funds and would be unjustly enriched if not required, as permitted by 12 U.S.C. § 5565(a)(2)(D), to disgorge or compensate consumers for the funds or the value of the benefits it received.

## DEMAND FOR RELIEF

WHEREFORE, the Bureau requests, under 12 U.S.C. § 5565, that the Court:

    a. Impose appropriate injunctive relief against the Debt-Relief Defendants for their violations of the TSR and the CFPA;

    b. grant additional injunctive relief as the Court may deem to be just and proper;

    c. award monetary relief against Defendants including but not limited to the refund of monies paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

    d. award the Bureau civil money penalties;

    e. award the Bureau the costs of bringing this action; and

    f. award such other and additional relief as the Court may determine to be just and proper.

Dated: March 16, 2021

Respectfully submitted,

/s/ Owen Martikan
Owen Martikan
Mary K. Warren (*pro hac vice* pending)
*Senior Litigation Counsel*
Consumer Financial Protection Bureau
1700 G St., NW
Washington, DC 20552

Telephone Martikan: (415) 844-9790  
Telephone Warren: (202) 435-7815  
Email: owen.martikan@cfpb.gov  
mary.warren@cfpb.gov  

*Attorneys for Plaintiff Consumer Financial Protection Bureau*